Argued December 10, 1941; reversed March 17; rehearing denied April 14, 1942

# H. MILGRIM AND BROS., INC., *v.* SCHLESINGER

## ET AL.

(123 P. (2d) 196)

Before Kelly, Chief Justice, and Bailey, Lusk, Rand, Rossman and Brand, Associate Justices.

*George L. Belt*, of Salem (Carson & Carson, of Salem, on the brief), for appellant.

*Asa L. Lewelling*, of Salem (Ross & Ford, of Salem, on the brief), for respondents.

478

LUSK, J. The only reasonable conclusion to be drawn from the evidence is that the defendants appropriated the nationally known and highly valuable trade name of the plaintiff for the advantage that would accrue to them from the plaintiff's reputation as a merchant. They would reap where they have not sown. Their purpose was deception of the buying public. Since they admit knowledge of the existence of the plaintiff's store in New York, they must have known of the plaintiff's standing as designer, manufacturer and seller of dresses, coats and other articles of women's apparel, and that the name "Milgrim", standing as it does for what is called "style", high quality of fabrics and fine workmanship, is an asset of great value to anyone engaged in that business. Their explanation, therefore, that they chose "Milgrim" as "an easy name to pronounce and easy to remember" is scarcely deserving of serious consideration. It is enough to say that if their professed reason was their real reason, the number of names from which they could have selected one that would answer their requirements, without trespassing on the rights of others, is legion.

■ Nor are we willing to accept the defendants' claim that they were unaware that retail stores in Portland

handled the plaintiff's merchandise and advertised its name. It is opposed to all the probabilities that they should have been so ignorant of the activities of merchants in the same line of business in a city some fifty miles distant and which, as the testimony shows and we know judicially, is in the same trade area as Salem. Moreover, of the three members of the defendants' partnership only Sol Schlesinger testified; there is no explanation of the others' failure to take the stand, and we are left in the dark as to the extent of their knowledge upon this subject.

■ Basically, the plaintiff's complaint charges unfair competition, and we need not concern ourselves with the law of trade-marks, which is "but a part of the broader law of unfair competition", *United Drug Co. v. Theodore Rectanus Co.*, 248 U. S. 90, 97, 63 L. Ed. 141, 39 S. Ct. 48; *Hanover Star Milling Co. v. Metcalf*, 240 U. S. 403, 413, 60 L. Ed. 713, 36 S. Ct. 357; *Union Fishermen's Co-op. Packing Co. v. Point Adams Packing Co.*, 108 Or. 535, 548, 217 P. 642. The plaintiff's right to the name "Milgrim" "grows out of its use", *United Drug Co. v. Rectanus Co.*, supra. The general rule governing infringement of a trade name is thus stated in the Restatement, Torts, Vol. 3, p. 562, § 717:

"(1)  One infringes another's trade name, if
"(a)  without a privilege to do so, he uses in his business, in the manner of a trade-mark or trade name, a designation which is identical with or confusingly similar to the other's trade name, though he does not use the designation for the purpose of deception, and
"(b)  the other's interest in his trade name is protected with reference to
     "(i) the goods, services or business in connection with which the actor uses his designation, and

"(ii) the markets in which the actor uses his designation."

■ Or, as this court said in *Columbia Engineering Works v. Mallory*, 75 Or. 542, 546, 147 P. 542:

"But a court of conscience is justified in stamping the brand of commercial piracy upon the wares of defendant if he puts them upon the market in such form and manner as to deceive the purchasing public into the belief that such wares were made by plaintiff".

Much of the argument on behalf of the defendants is based upon the premise that there is no infringement here because the plaintiff and defendants are not found in the same markets; but it is a false premise, because the plaintiff's market, like its reputation and the prestige of its name, is nation-wide, and, more especially, because the plaintiff's merchandise has been sold in Portland—and to some extent to Salem residents—for many years by Portland merchants, and advertised in the Portland newspapers, which, of course, have a large circulation in Salem as well as in other parts of the state. Salem, a city of 30,000 inhabitants, is 52 miles, a little over an hour by automobile or bus from Portland, and, as stated, is in the Portland trade area.

The Restatement, *ibid.*, 604, § 732, discussing the question of the territorial limits within which the right to the exclusive use of a trade name exists, says:

"If the trade-mark or trade name is unknown in a particular territory and there is no probability that it will become known there, the use of a similar designation in that territory will cause no harm to the person having the trade-mark or trade name, since it cannot lead to mistaken association with that person. Such might be the case of the trade name of a grocery store in a small city in northern New York and a similar designation used for a grocery store in Brooklyn, N. Y. On the other hand, a large department

store in New York City might draw trade not only from the entire State of New York but even from distant States, either by mail or through the personal shopping of frequent non-resident visitors. Between the case of the local grocery store, at one extreme, and the nationally advertised house doing a nation-wide business, at the other, there is a progression of businesses with more or less extensive markets. In each case the issue is whether, in the territory in which the similar designation is used, there are or are likely to be a considerable number of prospective purchasers of the goods or services in connection with which the trade-mark or trade name is used, who are likely to be misled by the similarity. On this issue, the good or bad faith of the alleged infringer is an important factor. If he imitates the other's trade-mark or trade name knowingly and acts in other ways to convey the impression that his business is associated with the other, the inference may reasonably be drawn that there are prospective purchasers to be misled. The actor's purpose to forestall expansion of the other's business is also an indication of the extent, in fact, of the other's interest in his trade-mark or trade name and of the limits within which the interest requires protection. A State may, therefore, recognize and protect a trade-mark against infringement within its borders before the trade-mark is used in the State, if the trade-mark has acquired a reputation elsewhere and, under the circumstances stated in this Section, custom in the State may reasonably be expected.''

At p. 548, the Restatement, *ibid.*, gives the following illustration, quite pertinent to the facts of the instant case, of conduct that will be enjoined as unfair competition:

''A operates some retail stores and a mail order business. It has no store in Boston but residents of Boston on occasion patronize A's New York store and also order goods from A by mail. B opens a store in Boston which he represents to be a branch of A. B is subject to liability to A.''

The record here shows without contradiction that the plaintiff was in the trade area of which Salem is a part, and to a certain extent in Salem itself, with its goods and its name long before the defendants undertook to adopt that name and use it in connection with the same general character of business; and the cases, therefore, relied on by the defendants and which hold that there is no infringement where there are widely separated markets, have no application whatsoever to the facts of the instant case. See, *Hanover Star Milling Co. v. Metcalf*, supra; *General Baking Co. v. Goldblatt Bros., Inc.*, 90 Fed. (2d) 241; *Eastern Outfitting Co. v. Manheim*, 59 Wash. 428, 110 P. 23, 35 L. R. A. (N. S.) 251; *Code v. Seattle Theatre Corp.*, 162 Wash. 379, 298 P. 432.

There are additional reasons why the plaintiff is entitled to equitable relief. The Restatement, *ibid.*, says at p. 542:

"But there are many cases of trade-mark infringement which are not cases of 'passing off' in the historical sense, such as those in which the actor and the other are not trade rivals and there is no diversion of custom from the other to the actor, or those in which the actor does not act fraudulently."

And again, after referring to infringements between competitors, it is said (p. 597):

"More subtle forms of infringement developed later when trade-marks and trade names became not simply indicia of source to purchasers who cared about source, but also powerful advertising and sale factors. An attractive, reputable trade-mark or trade name could then be imitated not for the purpose of diverting trade from the person having the trade-mark or trade name to the imitator, but rather for the purpose of securing for the imitator's goods some of the good-will, advertising and sales stimulation of the trade-mark or trade name. Thus, A who begins to sell suits under a designa-

tion like that of B who sells only overcoats does not hope that persons desiring to buy B's coats will buy A's suits under the mistaken belief that they are B's coats. Diversion of trade to himself from B is not A's purpose or the necessary effect of his conduct. Yet his conduct may cause B the same harm that is caused by such diversion. Persons previously satisfied with B's coats might have an unsatisfactory experience with A's suits and cease to buy the coats because of the mistaken belief that B is responsible for both. Or, persons who have had no previous experience with B's coats might for the same reason never acquire such an experience. The loss of trade caused to B by A's conduct is equally harmful whether the trade goes to B or to third persons. One's interest in a trade-mark or trade name came to be protected against simulation, therefore, not only on competing goods, but on goods so related in the market to those on which the trade-mark or trade name is used that the good or ill repute of the one type of goods is likely to be visited upon the other. Thus one's interest in a trade-mark or trade name is protected against being subjected to the hazards of another's business.''

As illustrative of the foregoing text attention is called to the following cases: In *Great Atlantic & Pacific Tea Co. v. A. & P. Radio Stores, Inc.*, 20 Fed. Supp. 703, the defendant adopted as part of its trade name "A & P", the name by which the plaintiff was familiarly known to the public. Plaintiff and defendant did not sell the same articles. The use of the plaintiff's nickname was enjoined, the court quoting in its opinion from the opinion of Circuit Judge Learned Hand in *Yale Electric Corporation v. Robertson*, (C. C. A.) 26 Fed. (2d) 972, 974, as follows:

"However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court.

His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask.''

The court continued:

''It is on the basis of this developing conception of unfair competition that the courts have repeatedly restrained the use of similar trade-marks on noncompeting goods. (Citing cases.)

''I am satisfied that in the present case defendant's name was chosen with an eye to the value of the letters 'A & P' as the plaintiff's trade-name because of the widespread acquaintance of the buying public with them as such. It undoubtedly hoped to appropriate some of that value to itself. This was an unfair interference with the plaintiff's trade-name, and it is clear under the cases to which I have referred that the court has authority to enjoin it. It is equally clear that the granting of relief need not be conditioned upon the showing of actual deception of the public. Gehl v. Hebe Co., (C.C.A.) 276 F. 271.''

In *Wall v. Rolls-Royce of America, Inc.*, (C. C. A.) 4 Fed. (2d) 333, the defendant sold radio tubes under the name of Rolls Royce Tube Company. The plaintiff had for many years manufactured automobiles and airplanes under the name of Rolls-Royce of America, Inc. In *Aunt Jemima Mills Co. v. Rigney & Co.*, (C. C. A.) 247 Fed. 407, L. R. A. 1918 C, 1039, the plaintiff manufactured pancake flour and the defendant appropriated the name ''Aunt Jemima'' for use in connection with the manufacture and sale of syrup. The plaintiff in *Vogue Co. v. Thompson-Hudson Co.*, (C. C. A.) 300 Fed. 509, published a style magazine and the defendant simulated its trade-mark in connection with the

sale of hats. In *Duro Co. v. Duro Co.*, (C. C. A.) 27 Fed. (2d) 339, the defendant adopted the trade name of the plaintiff in connection with its business of manufacturing spark plugs. The plaintiff's business was the manufacture of small combustion engines. In *Great Atlantic & Pacific Tea Co. v. A. & P. Cleaners*, 10 Fed. Supp. 450, the defendant, engaged in the dyeing and cleaning business, copied the trade-mark of the plaintiff, which was engaged in an entirely different business. In *Del Monte Special Food Co. v. California Packing Corporation*, (C. C. A.) 34 Fed. (2d) 774, defendant used the plaintiff's trade name "Del Monte" in connection with the sale of oleomargine, which was not sold by the plaintiff. In *Alfred Dunhill of London, Inc., v. Dunhill Shirt Shop*, 3 Fed. Supp. 487, the plaintiff sold smokers' requisites, the defendant shirts. The defendant appropriated the name Dunhill. In *L. E. Waterman Co. v. Gordon*, (C. C. A.) 72 Fed. (2d) 272, the plaintiff sold fountain pens and the defendant razor blades. The defendant appropriated the plaintiff's name, "Waterman".

In each of these cases the defendant was enjoined from using the plaintiff's trade name, notwithstanding the parties dealt in different manufactured articles or products and were not rivals for the same trade. The courts proceeded upon the view that a man need not submit to having his reputation and the good will of his business jeopardized by another appropriating his trade name, even for use in a different kind of business—a view consonant with decent standards of commercial ethics and agreeable to the underlying principles of equity jurisprudence. "In this way", as the court said in *Aunt Jemima Mills Co. v. Rigney & Co.*, supra, "the complainant's reputation is put in the hands of the defendants"; or again, "defendant's

use of plaintiff's trade-mark stakes the reputation of the plaintiff upon the character of defendant's goods''. *Standard Oil Co. v. California Peach & Fig Growers, Inc.*, (C. C. A.) 28 Fed. (2d) 283. The defendants here, as the court observed in *Wall v. Rolls-Royce of America, Inc.*, supra, could have had but one object, to commercially use as their own ''a commercial asset that belonged to others, the continued use and abstraction of which is so fraught with such possibilities of irremediable injury that the only way to remedy it is to stop it at the start.''

The rule of these authorities, we think, is the complete answer to the defendants' argument that they are not to be disturbed in their wrongful use of the plaintiff's name, because they sell only inexpensive wearing apparel and appeal only to ''low-income'' groups for patronage, whereas the plaintiff deals in high-priced merchandise which attracts a different class of customers. We are told that this difference ''entirely eliminates the possibility of confusion of source, and the possibility of diversion of trade''. It does not, however, entirely eliminate the possibility of damage to the plaintiff's reputation and prestige likely to result from the association of plaintiff's name with the defendants' merchandise. It is true that the defendants allege in their answer that the quality of their merchandise ''is fully equal to, if not superior to, plaintiff's merchandise'', but, in view of the contention we are now considering, we attach no importance to that assertion. We intend no criticism of the defendants' merchandise, which, for all we know, is excellent of its class; but it would be absurd to suppose that the higher priced merchandise sold by the plaintiff is not of superior quality.

This, however, is beside the mark. The point is that the plaintiff need not take the risk of injury involved in the unauthorized use of its name by the defendants, no matter what may be the quality of their merchandise.

The two Oregon cases cited by the defendants do not support their contention. In neither was an intention to deceive the public and capitalize upon the plaintiff's trade name or trade-mark shown. In *Union Fishermen's Co-op. Packing Co. v. Point Adams Packing Co.*, supra, an injunction was denied because there were so many dissimilarities between the label used on canned salmon by the plaintiff and that used by the defendant as to preclude the idea of deception of the public, and for the further reason that the court thought that canned salmon is not purchased on the strength of labels but of brands. In *Federal Securities Co. v. Federal Securities Corporation*, 129 Or. 375, 276 P. 1100, 66 A. L. R. 934, it was also held that in the particular kind of business involved it was not the name of the institution that attracted customers, and, moreover, there were circumstances in that case which would have made it inequitable to enjoin the use by a foreign corporation of a name adopted in good faith and used by it for many years before it came in conflict with the plaintiff's name in this state.

The case here is quite different, for it is but stating the obvious to say that an established name is a potent factor in the promotion of the sale of women's dresses, coats and other wearing apparel; and the evidence conclusively shows the value of the plaintiff's name in that regard.

Nor are the cases (cited by defendants) of *Diamond Drill Contracting Co. v. International Diamond Drill Contracting Co.*, 106 Wash. 72, 179 P. 120, and *Women's Mutual Benefit Soc. v. Catholic Soc.*, 304 Mass. 349,

23 N. E. (2d) 886, of persuasive force here. In neither case was the court concerned with a trade name as applied to a class of commodities but rather as applied to a business. In the former case the name had acquired no secondary meaning and was merely descriptive of the business, which the plaintiff did not originate; in the latter the controversy was between two non-competing fraternal corporations with different purposes and different requirements for membership and the element of wrongful intent was wanting in both cases.

■ It is true that there is no evidence that any person has been led by defendants' conduct to purchase their goods in the belief that they are the goods of the plaintiff, but that is not necessary to make out a case of unfair competition. *Columbia Engineering Works v. Mallory*, 75 Or. 542, 547, 147 P. 542; *Union Fishermen's Co-op. Packing Co. v. Point Adams Packing Co.*, supra (108 Or. 549); *Gehl v. Hebe Co.*, (C. C. A.) 276 Fed. 271; *Great Atlantic & Pacific Tea Co. v. A. & P. Radio Stores, Inc.*, supra. Beyond this, as the Restatement, *ibid.*, emphasizes (p. 603), the intent of one appropriating the trade name of another is an important factor in determining whether deception of the public is likely to follow. "If the actor knows of the other's trade-mark or trade name and adopts the identical or a confusingly similar designation for the purpose of misleading purchasers and attracting to himself the good-will and reputation associated with the other, the likelihood that prospective purchasers will be so misled may more easily be inferred."

■ It is unnecessary to prolong the discussion. According to the Restatement, *ibid.*, p. 538, "the scope of liability in this field is constantly expanding. This is

due partly to the flexibility and breadth of equitable relief and partly to changing methods of business and changing standards of commercial morality.'' In any view that may be taken, we are of the opinion that the plaintiff is clearly entitled to a decree enjoining the defendants from using its name in connection with their business and merchandise in any way whatsoever. The circuit court, by its decree, ordered:

"That defendants shall not use any neon, or other, business sign on which the word, 'Milgrim', shall appear unless there also be prominently set forth on and by such sign the words, 'of Salem'; that defendants shall cause to be prepared and shall place in prominent places in their store, placards lettered and printing in large block type, capable of being easily read for a distance equal to the width of said store, on which shall appear substantially the words, 'This firm has no connection with any New York, or other, firm of like or similar name', and that such same matter shall also be made prominently to appear in all newspapers, or other, advertising that may be done hereafter by defendants, and that if labels are used in coats, suits or other merchandise sold by defendants, the same shall not bear any resemblance to the registered labels or trade-marks in use by plaintiff."

We think that the remedy thus granted does not suffice. There should be no palliation of intentional wrong.

■ There is no satisfactory basis in the evidence for an accounting and that relief, therefore, will be denied. See *Vogue Co. v. Thompson-Hudson Co.*, supra.

The decree of the circuit court is reversed and the cause remanded with instructions to enter a decree in accordance with this opinion.